CORVALLIS & E. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 2, 1911.)

No. 1,926.

1. RAILROADS (§ 481*)—FIRES—EVIDENCE.

In an action by the United States against a railroad company to recover for loss of timber alleged to have been burned through defendant's negligence in permitting inflammable material to accumulate on its right of way, in which fire was started from an engine and spread into the timber on a forest reservation, a letter written by a forest inspector to the secretary of defendant some time before the fire, inclosing a report from a ranger as to the dangerous condition of the right of way, and asking that it be remedied, was not inadmissible as a self-serving declaration, but was properly admitted to show actual notice to defendant of the condition referred to therein; the fact being otherwise proved.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 481.*]

2. RAILROADS (§ 481*)—FIRES—ACTIONS—EVIDENCE—CONDITION OF MACHINERY.

On an issue as to the condition of a locomotive alleged to have caused a fire on defendant's right of way because of its defective condition which permitted the escape of fire and sparks, the admission in evidence of the testimony of the fireman of defendant's machine shop as to the condition of the engine both before the fire and after its return from the trip on which the fire occurred, the purpose being to show its condition before and at the time of the fire, was not prejudicial error.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 481.*

Liability of railroads for injuries by fire as affected by management of locomotives, see note to Woodward v. Chicago, M. & St. P. Ry. Co., 75 C. C. A. 598.]

3. DAMAGES (§ 217*)—FIRES—INSTRUCTIONS—MEASURE OF DAMAGES.

Instructions as to the measure of damages, in an action by the United States to recover for loss of timber from a forest reservation by fire set by a locomotive on defendant's railroad, considered, and held without prejudicial error.

[Ed. Note.—For other cases, see Damages, Dec. Dig. § 217.*]

In Error to the Circuit Court of the United States for the District of Oregon.

Action at law by the United States against the Corvallis & Eastern Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

J. K. Weatherford, Wm. D. Fenton, Ben C. Dey, and James E. Fenton, for plaintiff in error.

Walter H. Evans, Asst. U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This action was brought by the United States in the court below against the Corvallis & Eastern Railroad Company, which operated a road in the state of Oregon extending from Detroit to Yaquina, to recover certain alleged damages. The ground of the action was the alleged negligence of the railroad company by which certain fires were started, resulting in the alleged injury to certain timber belonging to the government. That timber was within the Cascade Forest Reserve, through which the railroad company had a right of way for its road. In the first of the two counts contained in the complaint the plaintiff alleged that the defendant company negligently permitted inflammable material to accumulate upon its right of way, which, on or about July 23, 1906, was set on fire by fire falling from one of the defendant's locomotives, and which fire, so started, spread into the plaintiff's forest and burned and destroyed its timber, of the alleged value of $100, for the recovery of which damage, together with alleged amounts necessarily expended by the plaintiff in preventing the said fire from further spreading and destroying other timber of the plaintiff, the latter sought to recover by means of its first count.

The second cause of action counted on was based on a similar fire alleged to have occurred on the 11th of August, 1906, by reason of similar negligence on the part of the defendant in respect to accumulation of inflammable material on its right of way, and also by reason of other and further negligence, in that the defendant company negligently permitted its engine to be out of repair, to be unequipped with apparatus to prevent the escape of sparks, cinders, coal, and fire, and to be placed in charge of unskilled employés, which engine, so controlled, and in that condition, started the fire of August 11, 1906, in the aforesaid inflammable material, which fire spread to the plaintiff's timber, burning and destroying the same to the extent in value of $9,828.50, which sum, together with alleged amounts necessarily expended by the plaintiff in fighting that fire, it sought to recover by means of the second count of its complaint.

The case was tried with a jury and resulted in a verdict in the government's favor for $4,422.28, for which sum, together with costs amounting to $724.21, judgment was entered against the railroad company.

In support of the present writ of error, which that company sued out, it is contended that the court below erred in certain rulings respecting evidence, and also in respect to instructions given and refused.

[1] Much reliance seems to be placed by counsel for the plaintiff in error upon the point that error was committed in the admission in evidence of these two letters:

"Portland, Oregon, Apr. 24, 1906.

"Mr. John A. Shaw, Sec'y Corvallis & Eastern R. R., Albany, Oregon— Dear Sir: Your right of way through the Cascade Forest Reserve in T. 10 S. R. 5 E., is reported by Ranger Harry G. Hayes as being in a very dangerous condition as regards brush, débris, rotting logs, and ties, and is a menace to valuable timber owned by the government on account of the liability of a spark from an engine starting a fire in this inflammable material which might result in great damage to other property by the spreading of forest fires thus started, in the dry season.

"I inclose a copy of his report made after making a personal examination, and also a few kodak prints taken by him to verify his statements.

"In view of this dangerous condition of your right of way, I will ask you to take measures as soon as possible to clean up this right of way, and until this is accomplished, during the dry season to maintain a fire patrol after each train.

"While such action on your part cannot be compelled under the present state or federal laws, yet it would seem advisable for you to attend to this matter, both on account of the general good that would be accomplished by removing the danger to all property within a considerable distance of your line, and also for your own protection, as it is the opinion of the assistant United States attorney that damages could be collected for property destroyed through your neglect in leaving inflammable material on your right of way, and thus producing a menace to nearby property.

"I inclose copy of the opinion of the assistant United States attorney in this matter.

"If this right of way is not cleaned up by you in a thorough manner, and if a fire is started on account of neglect in not burning this débris, etc., resulting in damage to government timber, the government will at once take measures to recover full damages, on the grounds that the damage was caused by negligence on your part in allowing your right of way to be covered with inflammable material, which was a menace to the property of others.

"Very truly yours,          [Signed]   D. D. Bronson, Forest Inspector.
"[3 Enclosures.]"

"April 26, 1906.

"Mr. Daniel D. Bronson, Forest Inspector, Customs House, City—Dear Sir: Yours of the 24th inst. to hand relative to the condition of the right of way of the Corvallis & Eastern R. R. in township 10 south, range 5 east. I have sent the correspondence to Mr. J. K. Weatherford, vice president of the company, who will take the matter up with our superintendent. I will advise you as soon as possible in regard to what they will do relative to cleaning up the right of way.

"Yours truly,                           John A. Shaw."

The main ground of the objection to this evidence was that it constituted a self-serving declaration.

We do not think the objection has substantial merit. The letter of the inspector called the attention of the railroad company to a report made by a forest ranger as to the condition of its right of way, asked that suitable measures be taken to rectify the reported wrong, and called attention to possible consequences. Even if inadmissible, we cannot see that it could have been prejudicial to the defendant company. There was much positive testimony tending to support the contention of the government that the company permitted combustible material to accumulate upon its right of way, and, although a knowledge of the actual condition of its right of way is by law imputed to the company, the calling of its attention to a report of the ranger that it was in that unlawful condition was rather to the benefit of the company than to its injury.

[2] Based upon the rule that in actions for injury caused by alleged defective machinery evidence of its subsequent alteration or repair is incompetent to show that such machinery was defective before the happening of the injury, the plaintiff in error, by assignment, complains of certain testimony of the witness, Merle, who was foreman of the machine shop of the defendant company in which the engines in question were kept when not in use on the road. We extract from the record the proceedings on the trial covered by such assignments:

"Q. What was the condition, Mr. Merle, if you remember it, of the engines or engine which run up to Detroit at or about the 23d day of July as to its spark-arresting or fire-arresting devices and apparatus? A. After the engine being repaired, and being examined, and being reported several times, I eventually found the stack in bad condition.

"Q. Who reported it? A. Mr. Simpson, the engineer.

"Q. Who was he? A. He was running engines 1 and 2. We used to have two big engines and kept them for the east end of the run principally, and very seldom we would run a little engine on that run, because the work is heavy up there; and he was the man referred to.

"Q. What report did he make? A. Well, he made several reports.

"Whereupon said witness further testified that these reports were made on the roundhouse work report book, the regular record of the company; that book was put there by the company, given to him to put there for the engineers to make report on, and the engineers would make such reports on the return of each trip, if he had any work to be done. Lots of times they had no work to be done, and they just went right on home. Whereupon said witness was interrogated and testified as follows:

"Q. Now, do you remember whether or not Engineer Simpson made such a report on the day of this fire—yes, on the day of this fire, or do you know? A. Yes, sir.

"Q. In this book? A. Yes, sir.

"Q. After—on the return from the trip after the fire? A. Well, he told me that they claimed that they set fire. So that is all I—that is as near as I can say from the date of the book—that it is after the fire.

"Mr. Fenton: I move to strike that out as incompetent and not responsive.

"The Court: I will strike out the testimony as to the conversation with Simpson.

"Whereupon said witness further testified that the report book was missing in 1908, in the fall of the year. He went over in the morning. The book was there the night before. He went over to see if the man on the run had reported any work, which he done every night all the time he was there. Does not know what went with that book. It was taken out of there that night. The book is gone. Whereupon said witness was interrogated and testified as follows:

"Q. Will you please state the condition you found that engine in after the July 23d fire, pursuant to the report made to you? A. After the engine was reported, I examined the netting and stack. I told them it was pretty hot yet to examine—

"Q. Never mind what you told them. Tell the jury what you found. A. I got up and examined the engine with a torch. It was so hot you could not get in there, and the engine had to be used the next morning, and with a torch I could not see anything in the stack, because it was too hot to get your head down in there. I waited until about 8 o'clock, trying to find the master mechanic, to report to him what had happened; and they asked me if I could see anything. I told them, 'No,' and they allowed the engine to go out the next day.

"Whereupon said witness testified that this was after the fire.

"Whereupon counsel for defendant moved to strike out all of that, for the reason that it is incompetent and immaterial, and that any conversation the witness had, or what he told any other person, would not have any bearing.

"Whereupon the court said:

"The Court: The conversation he had would not be competent in this case, but what he saw in the examination of the engine would be competent.

"Whereupon said witness further testified that he went out on the following day. He reported the engine had thrown fire. Whereupon counsel for defendant moved to strike out that; whereupon the court said: Counsel asks you what you did, what you know by your examination, not what somebody told you. Whereupon said witness further testified as follows:

"They had to work at it the following day and concluded to hold the engine and take the stack off the engine, and the barrel of the stack of this engine stands up maybe two feet on the inside, cannot tell how many inches, could figure it out on a blueprint map. It had no hole out in the bottom of the barrel of the stack to allow cinders to go into the smoke box. The base of the stack to the top of the barrel was full of cinders, and they were hot. He got down on the floor and took all these cinders out. Searched the netting and could not find anything wrong with the netting. Held the smokestack there all that day until late in the evening, waiting for the master mechanic to come and look at it himself, to see if he could see anything wrong with it. He didn't come, and about 7 o'clock that night he had the stack on and told them, and let the engine go out. It went out a few days and he had to look at it again. Complaint made of the engine again. They concluded to take stack off and put another one on, and they done so, and shortly after this other engine that had this stack, it was reported, and he got up on this engine and looked at the stack, and found between the casting of the trapdoor, where the man that had put the netting in didn't have material enough to reach over to the flange, consequently he could take his rule by opening it two inches single thickness—two-foot rule—and put it between the casting and the netting. He went to work and got some pieces of netting—the engine had to be used—and put in three different pieces, he thinks. They have six courses in that or more. The same stack went on the second engine. On that engine at that time he put them in and flanged them out, and that stack was all right after that. Consequently he concluded there was trouble with the stack. He had taken that stack down before that and put two holes —had a machinist drill two big holes in the barrel of the stack. First thought that was the cause, and after the holes were cut in, and made the same as the other stacks, there were still complaints made, and after that he located the trouble under that trapdoor between the lower casting of the trapdoor, the base, and the netting, and he fixed it. Was up at Breitenbush Springs after the second fire, talking about it, one thing and another. It was after the second fire that he located that stack, but there was another stack reported on another engine afterwards, on two or three engines that run up there. Engine 2 was reported. It had been running up there. Engine 1 was reported again and found in bad condition.

"Whereupon said witness was further interrogated and testified as follows:

"Q. Now, on these examinations, what condition did you find the ash pan of this engine in? That is, the apparatus underneath to—

"Whereupon counsel for defendant objected to the same as incompetent, and as not pleaded. Whereupon said witness answered:

"A. Mr. Walsh had come and asked me to look over the ash pans at that time, and we found the ash pan netting. After looking at the stack and everything, he insisted on looking at all the ash pans. They looked at engine 1's ash pan, and the netting did not come up to the mud rim by two inches—the piece of netting. The ash pan is maybe from eight to ten inches deep, and the netting came—it is bolted on with three bolts on the bottom of the ash pan, two bolts on the side. There was a space of two inches. He looked through the wheel himself. He insisted on my putting a piece of netting across. We did not bolt it on, but sewed it on with wire, and it remained in that way that season.

"Whereupon said witness further testified that there was nothing between this mud ring and the piece of netting when the damper was open; when it was shut the damper was closed. There was an aperture for the escape of sparks and coals—you could put your arm through it—the full length of the

ash pan, full width of it. In one corner of that pan the ashes had accumulated all around. They were kind of hot, and it bucked it up. He corked in asbestos, and kind of fixed it down.

"Whereupon counsel for defendant moved to strike out all of the foregoing testimony referring to the ash pan, as hereinbefore set out, upon the ground that same is incompetent and not pleaded, which motion was overruled and exception allowed.

"Whereupon said witness further testified that he found a hole under the trapdoor casting and the stack, base of the trapdoor casting and the netting. Did not examine the stack door itself. Examined the netting and this underneath. It was a hard thing to get to. There is no other trapdoor except the one below there in the stack, in any of the nettings and stack, there is only the one trapdoor in the netting. The trapdoor is faced and set on it with hinges. The trip before that they found a hole in this netting. This was the day before the first fire. It was the trip before he examined the netting, as near as he can remember, immediately before the fire. The trapdoor netting was in bad order, and he repaired that there on the 23d or 24th—it might have been the 22d, it was the trip before that, the trip when it was reported for the fire. He repaired it when he examined it that time, repaired the trapdoor before the fire."

Passing the fact that the only ruling appearing in these proceedings against the plaintiff in error was that denying its motion to strike out the reference in the witness' testimony to the ash pan, we think no prejudicial error appears, since the evident purpose and scope of the evidence was to show the negligent condition of the engine prior to and at the time of the fire.

But one other question in the case calls for special mention, and that relates to the measure of damages. Counsel for the plaintiff in error contends that instructions requested by him upon that subject were not sufficiently and properly covered by the charge of the court, and further that, since the plaintiffs sought to recover only for timber burned and destroyed, the court was in error in referring in its charge to the land upon which the timber stood, and also in its reference to other timber of the government not burned or destroyed. The charge upon the point in question is as follows:

"The measure of damages in this case is the difference, if any, between the value of this timber immediately before the fire, and immediately after. I think it probably can be assumed from the way the case has been tried, and from the record in this case, that the value of this property consisted in the timber, and that the land, without the timber, is of no special value; at least the evidence has all been directed to show the amount of timber destroyed, and its value. Of course the land belongs to the government of the United States, and there is no law, I believe, under which it could be disposed of, but there is a law authorizing the sale of timber from government reserves under certain conditions and restrictions, and therefore, in arriving at the damages, if any, sustained by the plaintiff, it will be your duty to take into consideration the market value of the timber both burned and unburned upon the land immediately before and immediately after the fire, and the difference between such market values, if any, will be the damage sustained by the plaintiff to this land and the timber thereon. You are authorized in arriving at this conclusion to take into consideration the location of the land and the timber, its accessibility to market, and the transportation facilities, the quality of the timber, the effect of the burned timber upon the value of the other timber, adjacent to or surrounded by it, together with all the other evidence in the case. To the sum which you may find to be the damage the plaintiff is entitled to recover on account of the destruction of this timber, you will add the amount that it expended, or the amount the testimony shows that it expended in fighting these fires and in preventing them from spreading into

other. and adjoining timber, and to this latter item you will be justified in adding interest at 6 per .cent., or the legal rate.

"Now, in this, as in all cases, it is the duty of a party to reduce his damages as much as can reasonably be done under the circumstances, and therefore, if you believe from the testimony that, after this timber had been burned, it could have been disposed of by the government officials for any sum—according to what sum it could have been disposed of, if it had an opportunity to sell it—it was. I think, its duty to have done so and thus reduced the damages; but in determining that question, and in examining that view of the question, you will not overlook the fact as to whether there is a market for the sale of this timber; whether they had an opportunity to sell it; whether they could have disposed of it; and all the circumstances that surrounded the location and condition of this particular timber now in controversy. If these people could have sold this timber—if there was a market for it, and they could have sold it and gotten something for it—it was their duty to do so, and reduce the damages. If, on the other hand, they could not sell it, there was no market for it, and no opportunity to sell it, they were not negligent in failing to do so, and the government would be entitled to recover whatever damages it sustained by reason of the fire.

"I do not understand that one can negligently and carelessly cause a fire in a timber claim belonging to another, and then respond in damages to the full extent that the other suffered by reason of that fact because the timber would, from a speculative standpoint. be worth more money. Whether it is worth anything or not is of course dependent upon the market. After the timber is killed, the testimony in this case shows it will decay, and it will decay in a certain length of time. Now, if during that time, before it decayed, there was no market for the timber, no opportunity to sell it, no means by which a man could get any money out of it, the fact that it may have a speculative market value ought not, it seems to me, to be a reason why the damages should be reduced, provided the owner of the property exercised reasonable care and diligence and effort to dispose of the property and reduce the damages to the smallest possible extent, and in that view you have a right to consider this question as it appears from the testimony in this case. * * *

"Mr. Fenton: I think it but fair to your honor to call your honor's attention to the instructions that my Brother McCourt asked your honor to give, and which your honor gave on the subject of damages, where I think your honor used this expression, 'And the effect of the burned timber upon the value of the other timber adjacent to it,' in the last instruction. I think that is not pleaded, your honor, and, although my Brother McCourt insists upon it, I think I should call the attention of the court to it at this time.

"Mr. McCourt: I don't remember that your honor gave it. I was going to except because you didn't.

"The Court: Gentlemen, these instructions were submitted by the counsel, and it may be that in reading them I read more than I intended to. My attention has been called by Mr. Fenton to the fact that, in instructing as to the measure of damages, I said you might take into consideration the effect the burned timber would have upon the other timber standing adjacent. I did not intend to give that instruction. The question for you to determine is the injury to the timber that was destroyed."

While the instruction given by the court to the jury in respect to the duty of the plaintiff to minimize its damage by the sale of the damaged timber, if possible, was not as clear as it might have been made, still we are of opinion that the jury must have understood therefrom that that duty devolved upon the plaintiff, and that the effort to do so must be reasonable as to time as well as in all other respects.

[3] Nor do we think the contention of the plaintiff in error that the jury was left by the instructions to consider, in arriving at its verdict, damage to other timber of the plaintiff than such as was burned or destroyed, and to consider damage to the land upon which the

timber stood, is well founded. The record shows that at the close of the court's charge the counsel for plaintiff in error made objection to that clause thereof which reads, "And the effect of the burned timber upon the value of the other timber adjacent to it"; but counsel made no other or further objection, which he should have done if he had any. In response to the objection that was made, the court said to the jury:

"Gentlemen, these instructions were submitted by the counsel, and it may be that in reading them I read more than I intended to. My attention has been called by Mr. Fenton to the fact that, in instructing as to the measure of damages, I said you might take into consideration the effect the burned timber would have upon the other timber standing adjacent. I did not intend to give that instruction. The question for you to determine is the injury to the timber that was destroyed."

The court thereby limited the consideration of the jury to the timber that was destroyed, and, in our opinion, sufficiently instructed them as to the law governing the case.

The judgment is affirmed.